Filed 10/31/25  P. v. Gardnercraft CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br> v. <br><br> EMMANUEL DAVID GARDNERCRAFT, <br><br> Defendant and Appellant. | A170175 <br><br> (Solano County <br> Super. Ct. No. VCR238114) |

Defendant Emmanuel David Gardnercraft appeals a judgment entered upon his plea of no contest to illegal gun possession.  His sole contention on appeal is that the trial court erred in denying his motion to suppress evidence.  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant was charged with one count of possession of a firearm by a felon.  (Pen. Code, § 29800, subd. (a)(1); all statutory references are to this code.)  He moved to suppress evidence pursuant to section 1538.5 on the ground the firearm was found during an illegal search of his vehicle.

Officer Daniel Callison of the City of Vallejo Police Department testified to the following at the combined preliminary hearing and hearing on the suppression motion. On the afternoon of June 11, 2021, he and another

1

officer, William Rhodes, were on patrol. Their attention was drawn to a Buick, which was "just driving in the area." They checked the vehicle's license plate and learned the registration was expired. Callison turned on the patrol vehicle's lights to make a traffic stop. The Buick continued for about 30 seconds, making multiple turns before eventually pulling over. The delay was unusual; in Callison's experience, drivers pull over almost immediately when he initiates a traffic stop.

Callison approached the Buick and saw defendant in the driver's seat. Defendant told Callison he did not have a license or identification and explained he was from out of state, was having a family emergency, and was getting something to eat. Callison was unconvinced by this explanation, both because he thought it was odd that defendant was getting something to eat during a family emergency and because it was his experience that drivers who claimed a family emergency typically did so as a pretext to distract the officer.

Callison asked defendant to step out of the vehicle, and as defendant did so Callison saw a five-inch-long folding knife in plain view in the driver's door pocket. Callison was concerned for his safety and concerned there might be other weapons in the car, and he patted defendant down in search of weapons, finding none. He asked defendant for his name and birth date, and defendant responded, "Garcia [pause] David" and provided his correct birthdate. When questioned, defendant first said Garcia was his last name, then that it was his first name and that David was his last name. Callison thought the name defendant provided was false, and because of that, the presence of a weapon, and defendant's failure to stop promptly, Callison placed him in handcuffs and had him sit in the rear seat of the patrol vehicle. Defendant asked Callison why he was being arrested, and Callison said it

2

was because he had provided a false name. Defendant eventually provided his true name to Callison, who checked the information and learned defendant was an unlicensed driver and a convicted felon, and that he had a felony arrest warrant from a neighboring county. Callison then placed defendant under arrest.

During this interaction between Callison on defendant, Officer Rhodes was looking into the vehicle, and, according to Callison, saw "at least a couple items of contraband." After Callison handcuffed defendant, Rhodes searched the driver's-side area of the Buick—the side where the knife was in plain view—and found a loaded pistol beneath the driver's seat. This was an area that would be immediately accessible to defendant, if he returned to the car. Our review of Callison's body camera video, which was received in evidence, suggests Rhodes found the gun about the time defendant was being placed into the patrol vehicle: Before defendant was fully in the vehicle, Rhodes looked toward Callison and seemed to lift his arm, and Callison immediately said to defendant, "And you got a gun." Rhodes also saw a baggie on the back seat with suspected heroin residue in it, which Callison inspected after defendant was in the patrol vehicle.

Callison was "extremely happy" when Rhodes showed him the firearm, because they were taking an illegal gun off the streets, and he and Rhodes shared a "chest bump."

The body camera video shows that defendant asked Callison to retrieve his personal items such as his money, backpack and phone, from the Buick. Callison offered to allow defendant to finish his ice cream, noting that he had been "cool" with the police and had not done anything "dumb" with his gun, and that the main thing they were looking for was guns. Defendant asked if he could call someone to pick up his car, saying the person was "not too far

3

from here," and Callison demurred, saying the car might need to be towed. The body camera video shows defendant had stopped the car well away from the curb, blocking what appears to be a driveway.

After completing an inventory search of the Buick, Officer Callison arranged for it to be towed. He testified that he had had hundreds of vehicles towed in his career and on each occasion he had looked under the driver's seat during the inventory search.

The prosecutor argued the evidence seized was admissible because it was obtained during a protective search for further weapons after the knife was found and, alternatively, that it would inevitably have been discovered after defendant was arrested on the outstanding warrant, when the officers would have conducted an inventory search before towing the Buick.

The trial court denied the motion to suppress and found probable cause that defendant had committed the charged offense. Defendant then brought a motion to dismiss pursuant to section 995 on the ground the holding order was based on evidence obtained in violation of the Fourth Amendment. The trial court denied the motion.

Defendant pled no contest to unlawful possession of a firearm by a felon and admitted he had previously been convicted of felonies. (§ 29800, subd. (a)(1).) The trial court ordered two years of formal probation and imposed fines and fees. This timely appeal ensued.

## DISCUSSION

Defendant contends the trial court erred in denying his motion to suppress evidence. In considering this issue, we defer to "express or implied findings of fact [that are] supported by substantial evidence," but "[w]e independently review the trial court's application of the law to the facts." (*People v. Jenkins* (2000) 22 Cal.4th 900, 969.)

4

The Fourth Amendment to the federal Constitution—applicable to the states through the Fourteenth Amendment—protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." (U.S. Const., 4th Amend.; see *People v. Camacho* (2000) 23 Cal.4th 824, 829–830.) A warrantless search, such as took place here, is presumptively unreasonable, but there are exceptions to this rule. (*People v. Evans* (2011) 200 Cal.App.4th 735, 743.) One of those exceptions authorizes a police officer to carry out a protective search of the passenger compartment of an automobile, if he or she has a "reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." (*Michigan v. Long* (1983) 463 U.S. 1032, 1049 (*Long*).) The search must be limited to areas in which a weapon may be placed or hidden. (*Ibid*.) A limited search may be justified under this exception even if the suspect has been removed from the vehicle, if the officer has a "reasonable belief that [the suspect] posed a danger if he were permitted to reenter his vehicle" (*id*. at p. 1050), an inquiry in which a relevant factor is the hazardous nature of roadside encounters between police and suspects (*id*. at p. 1049; see *id*. at pp. 1051–1052 [if suspect not arrested, "he will be permitted to reenter his automobile, and he will then have access to any weapons inside"]).[1]

---

[1] In a search incident to *arrest*, on the other hand, officers may search only the arrestee's person and the area within his immediate control. (*Arizona v. Gant* (2009) 556 U.S. 332, 338–339.) Unless another exception to the warrant requirement applies, the officers may search the arrestee's vehicle without a warrant "only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." (*Id*. at p. 351.)

These principles were applied in *People v. Molina* (1994) 25 Cal.App.4th 1038. Officers stopped the defendant for speeding, and they smelled fresh beer, authorizing them initially to search the passenger compartment of the truck for open containers of alcohol, apparently after both defendant and his passengers had left the vehicle. (*Id.* at pp. 1041–1042.) When the officers did so, they saw knives and a billy club in plain view. (*Ibid.*) Further search revealed a gun magazine; a duffle bag with a loaded firearm in a back seat area that the officer believed was accessible from the driver's seat; and illegal drugs in a bag in one of the seat pockets. (*Id.* at pp. 1041–1042.) The appellate court found the search reasonable: Once the officers saw the knives and billy club, "they had reason to believe that their safety was in danger and, accordingly, were entitled to search the compartment and any containers therein for weapons." (*Id.* at p. 1042.)

The appellate court in *People v. Lafitte* (1989) 211 Cal.App.3d 1429 (*Lafitte*) reached a similar conclusion, framing the question before it as, "May law enforcement officers justify a protective search of a traffic detainee's car when the sole basis for believing the suspect dangerous was the plain view observation of a legal weapon within that vehicle?" (*Id.* at p. 1430.) The court answered that question, "Yes." (*Ibid.*) The facts were as follows. Sheriff deputies stopped the defendant for a Vehicle Code violation and, upon approaching the car, saw a knife. They told the defendant to leave the vehicle, handcuffed him, and ordered him to sit on the curb. (*Id.* at pp. 1430–1431.) One of the deputies searched the vehicle to get the knife and search for any more weapons before allowing the defendant back into the car to

The Attorney General does not seek to justify the search of defendant's car as a search incident to arrest, instead taking the position that defendant was merely detained when the gun was found.

6

obtain his registration; he found a handgun and loaded clip that the defendant possessed illegally. (*Id*. at p. 1431.) The appellate court concluded the search was justified under *Long*: "In *Long*, as here, the discovery of the weapon is the crucial fact which provides a reasonable basis for the officers' suspicion" that the defendant had additional weapons in the car. (*Lafitte*, at p. 1433.)

These authorities persuade us that the gun was found during a reasonable protective search. Defendant concedes that "the initial traffic stop . . . was lawful." Yet when the officers initiated the stop, defendant did not yield immediately and did not promptly give his correct name. It was Officer Callison's experience that when drivers claimed they were dealing with an unspecified "emergency," which is the excuse defendant offered for his inability to produce identification, they were generally trying to distract his attention. Then, when the driver's side door was opened, a five-inch-long knife was in plain view in the door pocket, leading Callison to be concerned for his safety. He led defendant away and handcuffed him, as Officer Rhodes looked into the vehicle. The body camera video shows that at the time Callison was putting defendant into the patrol vehicle, Rhodes was standing by the open driver's side door. It is a reasonable inference that he also saw the knife in the door pocket. Supporting this inference, the body camera video shows a conversation between the two officers a few minutes later in which Callison mentions there was a knife in the door and Rhodes agrees. It would therefore have been reasonable for Rhodes to search those portions of the vehicle that would be readily accessible to defendant when he returned to the car. (*Lafitte*, *supra*, 211 Cal.App.3d at p. 1433; *Molina*, *supra*, 25 Cal.App.4th at p. 1042.)

7

Defendant argues Rhodes did not need to search the vehicle to ensure officer safety because he was already handcuffed and in the patrol vehicle. And he points out that when he was handcuffed, he asked Callison why he was being arrested, and Callison answered that it was because he had given a false name. This indicates, defendant argues, that Rhodes would have heard this exchange and believed he was indeed under arrest and in no danger of returning to his car and using any weapon against the officers.

We disagree with this characterization of events. Removing a person from a car, handcuffing him, and placing him in a patrol car does not necessarily transform a detention into an arrest. (*People v. Celis* (2004) 33 Cal.4th 667, 675.) Although Callison had reasonable cause to be concerned for his safety and skeptical of the name defendant provided, he had not yet learned of grounds to arrest defendant—that is, defendant's true name and status as a felon, and the active arrest warrant issued for him—when he handcuffed defendant and placed him in the patrol vehicle. Our review of the video shows that defendant was speaking softly when he asked why he was being arrested, and there is no reason to conclude that Rhodes both heard the question *and* concluded from Callison's response that defendant would not be returning to his car. And Callison testified that until he confirmed that defendant was subject to an arrest warrant, defendant was merely detained rather than arrested. Indeed, defendant seems to acknowledge that when Rhodes found the gun, defendant was only detained and not under arrest.

Defendant also argues that if Callison had truly believed defendant was a danger, he would have confiscated the knife or warned Rhodes of its presence. This argument ignores the timeline for Callison's concern about the knife and the gun. Finding the knife caused Callison sufficient concern for officer safety that he patted defendant down after removing him from the

8

car—an action defendant acknowledges was proper.  Callison then placed defendant in the patrol car, handcuffed, at which point defendant obviously had no access to weapons in his own car.  But if Callison had released defendant with a citation rather than arresting him, defendant would presumably have gotten back into the driver's seat and, at that point, had access to his knife and any other weapons nearby—including, as it happens, the loaded gun under the driver's seat, which would have been readily accessible to him.  Hence, the need for a protective sweep while defendant was detained but not arrested.

In sum, we conclude the protective search was reasonable under the rule of *Long*.  (*Long*, *supra*, 463 U.S. at pp. 1049–1052.)  On this basis, the trial court properly denied the motion to suppress evidence.

## DISPOSITION

The judgment is affirmed.

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
PETROU, J.

*People v. Gardnercraft* (A170175)

9